## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

JILL KERNS, Individually and on Behalf of
All Others Similarly Situated,

      Plaintiff,

v.

DEMERT BRANDS, LLC,

      Defendant.

Case No.:  CV-22-144-BLG-SPW-TJC

**CLASS ACTION COMPLAINT FOR**:

1. VIOLATION OF MONTANA'S UNFAIR TRADE PRACTICES ACT;
2. NEGLIGENT MISREPRESENTATION/OMISSION
3. STRICT LIABILITY-FAILURE TO WARN;
4. STRICT LIABILITY-MANUFACTURING DEFECT

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff, Jill Kerns, individually and on behalf of all others similarly situated, files this Class Action Complaint ("CAC") against Defendant DeMert Brands, LLC ("Defendant"), and in support states the following:

### NATURE OF THE ACTION

1.        This is a class action lawsuit by Plaintiff, and others similarly situated, who purchased and used Not Your Mother's brand dry shampoo products. Defendant distributes, markets and sells these products over-the- counter ("OTC") under the Not Your Mother's brand name. Defendant's dry shampoo products have been found by an independent laboratory to be contaminated and/or adulterated with benzene, a known human carcinogen. The presence of benzene in Defendant's products was not disclosed in the products' label other otherwise made known to

1

consumers, in violation of Montana law and other the putative class representatives' states' laws.

2.     Plaintiff and the putative class suffered economic damages due to Defendant's misconduct (as set forth below) and they seek, among other things, injunctive relief and restitution for the full purchase price of the product(s) they purchased. Plaintiff alleges the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiff further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

3.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and is a class action in which there are more than 100 class members and many members of the class are citizens of a state different than Defendant.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiff Jill Kerns suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendant conducts substantial business in this district, Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## THE PARTIES

5.          Plaintiff Jill Kerns resides in Yellowstone County, Montana, and at all times relevant hereto has been a resident of Yellowstone County. Within the class period, Plaintiff purchased and used Not Your Mother's dry shampoo products, which she purchased in Billings, Montana. Most recently, on or about October or November 2022, Plaintiff purchased Not Your Mother's Clean Freak Dry Shampoo at Target in Billings, Montana. When purchasing the products, Plaintiff read and reviewed the accompanying labels and disclosures, as well as Defendant's advertising claims, and understood them as representations and warranties by the manufacturer that the products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that any amount of benzene was or risked being contained in the products she purchased, she would not have purchased and used the products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for dry shampoo products that contained or were at risk of containing the carcinogen benzene. As a result, Plaintiff suffered injury in fact when she spent money to purchase dry shampoo products she would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as alleged herein. Moreover, the decision to purchase or not purchase dry shampoo products that contain or may contain benzene at any level is a financial and healthcare decision that affects Plaintiff in a very personal and individual way, thus conferring a particularized injury. By failing to disclose the presence of benzene or the risk of benzene contamination in its products' labels and advertising and marketing material, Plaintiff has been denied the opportunity to make those informed financial and healthcare decisions. As a result, Plaintiff has Article III standing.

6.          Defendant DeMert Brands, LLC is a Florida limited liability company with its

principal place of business located at 15402 N. Nebraska Ave., Ste. 102, Lutz, Florida, 33549. Defendant manufactured, marketed, designed, promoted and/or distributed the Products at issue.

**INTRODUCTION**

7.     Around 2020, Valisure LLC and ValisureRX LLC ("Valisure"), an analytical pharmacy, ran tests on dozens of manufacturers' sunscreen products, primarily aerosol products. Through its testing, Valisure discovered that certain aerosol sunscreen products contained benzene, a known human carcinogen, with values ranging from less than 0.1 parts per million ("ppm"); to 0.10 ppm to 2 ppm, to more than 2 ppm.[1]

8.     Based on its findings, on May 25, 2021, Valisure filed a Citizen Petition with the Food and Drug Administration ("FDA") asking the agency to recall all batches of sunscreen products that contained 0.1 ppm or more of benzene, on the basis that they are adulterated under federal law and values above 0.1 ppm pose known risks to human health.[2] At that time, Valisure advised the FDA, as well as the aerosol manufacturing community, that "the presence of benzene appears to be from contamination in the identified sunscreen products." *Id.*

9.     After Valisure's Citizen Petition was filed in May 2021, litigation related to benzene contamination in sunscreen began immediately, including against Defendant's competitor Johnson & Johnson ("J&J"). J&J began an internal investigation, and quickly revealed that the source of its products' benzene contamination was the propellant that sprays the product out of the can. Less than two months later, on July 14, 2021, J&J announced it was voluntarily recalling all lots of Neutrogena and Aveeno aerosol sunscreen product lines due to the presence of benzene in samples of the recalled

---

[1] https://assets-global.website-files.com/6215052733f8bb8fea016220/62728f83d7f91acc8572e9ee_FDA-2021-P-0497-0001_attachment_1.pdf

[2] *Id.*

products.[3]

10.     Also in July 2021, Valisure's CEO stated in an interview that the root cause of the

benzene contamination would likely be traced to contaminated raw materials, and that he did not

believe that the problem was limited to aerosol sunscreens, or sunscreens in general,[4] thus again

putting all aerosol manufacturers on notice that the benzene contamination issue was likely a much

broader.

11.     On November 3, 2021, Valisure filed another Citizen Petition with the FDA—this

time to address benzene contamination in various manufacturers' antiperspirant and deodorant

products. Through its testing, Valisure discovered that some of the Defendant's aerosol

antiperspirant products contained benzene, with values ranging from 0.97 parts per million ("ppm")

to 5.21 ppm in Suave 24 Hour Protection aerosols.[5] Valisure found that products containing butane

were at higher risk of having elevated benzene levels and warned that "'propellants' like butane,

isobutane, propane, and alcohol are commonly used and could potentially be sources of benzene

contamination."[6] By November 23, 2021, manufacturers began issuing recalls of aerosol deodorant

and antiperspirant products.[7]

12.     By December 2021, the FDA was likewise advising manufacturers to test for benzene

contamination, indicating that the cause of benzene contamination may be related to the propellant

---

[3] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson- consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol.

[4] https://www.reuters.com/world/us/fda-investigating-how-known-carcinogen-wound-up-jj-sunscreen-2021-07-16

[5] https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf.

[6] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-body-spray-products.

[7] https://www.bostonglobe.com/2021/12/23/business/fda-tells-drugmakers-test-benzene-contamination/.

isobutane.[8]

13.     On October 31, 2022, Valisure filed yet another Citizen Petition with the FDA – this time to address the potential benzene contamination in various manufacturers' dry shampoo products, including Not Your Mother's dry shampoo products. Valisure found that most of the Not Your Mother's dry shampoo products that were tested had excessive levels of benzene.[9]

14.     Plaintiff and putative Class member purchased and used one or more of the following Not Your Mother's dry shampoo products that were specifically identified by Valisure as containing benzene at or above 0.1 ppm:

| Brand | UPC | Lot | Description |
|-------|-----|-----|-------------|
| Not Your Mother's | 688047130500 | 21090 | Beach Babe Texturizing Dry Shampoo - Toasted Coconut - 7 oz |
| Not Your Mother's | 688047130098 | 21145 | Clean Freak Refreshing Dry Shampoo - Original - 7 oz |
| Not Your Mother's | 688047130296 | 21070 | Clean Freak Refreshing Dry Shampoo - Unscented - 7 oz |
| Not Your Mother's | 688047130975 | 20356 | Triple Threat Brunette Dry Shampoo - Hint of Brunette Tinted Powder - 7 oz |

---

[8] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-nationwide-recall-suave-24-hour-protection-aerosol-antiperspirant-powder.
[9] *Id.*

| Not Your Mother's | 688047130296 | 21188 | Clean Freak Refreshing Dry Shampoo - Unscented - 7 oz |
|---|---|---|---|
| Not Your Mother's | 688047130517 | 21141 | Plump for Joy Body Building Dry Shampoo - Orange Mango - 7 oz |
| Not Your Mother's | 688047130500 | 21124 | Beach Babe Texturizing Dry Shampoo - Toasted Coconut - 7 oz |
| Not Your Mother's | 688047130500 | 21179 | Beach Babe Texturizing Dry Shampoo - Toasted Coconut - 7 oz |
| Not Your Mother's | 688047130517 | 21181 | Plump for Joy Body Building Dry Shampoo - Orange Mango - 7 oz |
| Not Your Mother's | 688047130098 | 20280 | Clean Freak Refreshing Dry Shampoo - Original - 7 oz |
| Not Your Mother's | 688047130500 | 21063 | Beach Babe Texturizing Dry Shampoo - Toasted Coconut - 7 oz |
| Not Your Mother's | 688047130296 | 21009 | Clean Freak Refreshing Dry Shampoo - Unscented - 7 oz |

| Not Your Mother's | 688047130296 | 21195 | Clean Freak Refreshing Dry Shampoo - Unscented - 7 oz |
| Not Your Mother's | 5010724527481 | RF0167 | Dry Shampoo Clean & Classic Original - 6.73 fl oz |

15.     Defendant knew or should have known of the Products' benzene contamination well before Valisure's October 2022 petition. Defendant was required to subject the Products to rigorous quality assurance by Defendant's own internal guidelines and applicable laws and regulations. See 21 CFR 211.84 (representative samples of each shipment of each lot shall be collected for testing of active and inactive components (or raw materials) to ensure compliance with all established specifications). If Defendant had actual knowledge that there was a risk the Products could be contaminated with benzene prior to the October 2022 Valisure Petition, the company had an obligation to ameliorate and disclose that risk to consumers. If Defendant did not have actual knowledge that the Products could be contaminated with benzene prior to the October 2022 Valisure Petition, Defendant was reckless and/or negligent as a sophisticated producer of personal care products.

16.     Upon information and belief, to the extent Defendant disclaimed knowledge of the Products' benzene contamination prior to the October 2022 Valisure Petition, the company gained actual knowledge of that risk at least as early as July 2021. Around that time, Defendant's top competitors began recalling aerosol products due to the presence of benzene and faced litigation based on those recalls. Valisure's CEO was likewise warning at that time that the benzene contamination would likely be traced to contaminated raw materials. Moreover, in November 2021,

Valisure had confirmed the presence of benzene in dozens of aerosol antiperspirants, resulting in massive recalls and ensuing litigation.

17.     Despite Defendant's knowledge of the pervasive risk of benzene contamination in the Products, Defendant has failed to warn consumers of this known danger. Instead, Defendant has chosen to maximize its profits and delay the costs of immediately recalling the defective products it sold at the expense of its trusting customers who were unwittingly increasing their exposure to benzene contamination in the Products and continued to buy the Products. Consumers, like Plaintiff, depended on Defendant to disclose those risks but were, instead, presented with false, misleading, or incomplete representations regarding the safety and benefits of the Products and suffered damages as a result.

## BACKGROUND ON BENZENE

18.     Benzene is used primarily in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years. Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[10] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative

---

[10] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.

damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[11]

19.     The Food and Drug Administration ("FDA") similarly recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[12] and classifies benzene as a "Class 1" solvent that should be "avoided."[13] And the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "skin absorption" as an exposure route.[14] According to the National Toxicology Program ("NTP"), benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[15]

20.     "Even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[16]

21.     FDA's Guidance for Industry Q3C provides that "Solvents in Class 1 [i.e. benzene] . . . should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicities or deleterious environmental effect." That provision provides in full:

> III. SOLVENTS GROUPED BY CLASS Solvents in Class 1 [i.e. benzene] should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels

---

[11] *Id.* at 34.

[12] 14https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinksand-other-beverages#q1.

[13] https://www.fda.gov/media/71737/download.

[14] Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health (NIOSH), Benzene (https://www.cdc.gov/niosh/npg/npgd0049.html).

[15] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis added).

[16] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.

should be restricted … [to 2 ppm], unless otherwise justified.[19]

22.     Thus, although benzene should not be employed in the manufacture of drug substances, it may be used in manufacturing some drug substances when (1) its use is "unavoidable" to produce a drug product with (2) "significant therapeutic advance." Defendant's Products do not meet this safe harbor exception. This is because the use of benzene in the manufacture of the Products is not "unavoidable," nor does the use of benzene in the Products provide a "significant therapeutic advance."

23.     That the use of benzene is entirely avoidable is illustrated by Valisure's testing, which showed variation of benzene contamination in the batches of Not Your Mother's and other manufacturer's dry shampoo products tested contained detectible and/or or elevated levels of benzene and some did not. Given that benzene was detected in some dry shampoo products but not in others is evidence in itself that benzene is not required in its manufacture. Moreover, the Products do not represent a "significant therapeutic advance." The FDA has never considered dry shampoo products as representing a "significant therapeutic advance." And, considering the long history and widespread use of dry shampoo products, it does not appear that such products constitute a significant therapeutic advance.

24.     Following Valisure's May 2021 Citizen Petition, the FDA has been working with drug and cosmetic manufacturers on the specific issue of benzene contamination. This work has resulted in the agency issuing an FDA Alert reminding manufacturers that they "should not use benzene in the manufacture of drugs."[17] The agency has also worked with numerous manufacturers, including Defendant, over the past 1 ½ years to recall various aerosol products contaminated with

---

[17] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022).

benzene. The FDA's most recent Alert, published June 9, 2022, reaffirms the agency's long-standing position with respect to benzene in drug and cosmetic products, stating that "manufacturers should avoid using benzene in the manufacturing process."[18] The Alert further notes that this prohibition is consistent with the agency's 2017 guidance document: "Consistent with the recommendations of the ICH Q3 guidance, manufacturers should not use benzene in the manufacture of drugs."[19]

25.      Benzene is not listed as an active or inactive ingredient (or otherwise identified as being present) on any of the labels of Defendant's Products. Neither is the use of benzene as an undisclosed "residual solvent" authorized by FDA.[20] This because, as noted above, its use is not "unavoidable"  and its use in the Products does not constitute a "significant therapeutic advance." Simply put, benzene is not, and never has been, "authorized" by FDA for use in the manufacture of the Products, either as an ingredient, active ingredient, or residual solvent.

26.      Similar to FDA's Guidance for Industry Q3C, the FDA's Residual Solvent Guidance on the use of "residual solvents" for drug products (USP General Chapter) provides that because Class 1 cancer causing agents (like benzene) do not "provide therapeutic benefit," they should be "avoided" absent a showing that their use is "strongly justified" in a risk-benefit analysis. General Chapter 467 provides:

---

[18] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022).

[19]  https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022); Food and Drug Administration, Q3C – Tables and List Guidance for Industry (2017) (https://www.fda.gov/media/71737/download).

[20] See Residual Solvent Guidance, "Residual Solvents in Drug Products Marketed in the United States" (2009) (applying standards in USP General Chapter Residual Solvents).

> Because residual solvents do not provide therapeutic benefit, they should be removed, to the extent possible, to meet ingredient and product specifications, good manufacturing practices, or other quality-based requirements. Drug products should contain no higher levels of residual solvents than can be supported by safety data. Solvents that are known to cause unacceptable toxicities (Class 1, Table 1) [e.g., benzene] should be avoided in the production of drug substances, excipients, or drug products unless their use can be strongly justified in a risk-benefit assessment.[21]

27.     Upon information and belief, Defendant has never conducted a "risk benefit assessment" regarding the use of benzene as a residual solvent in its Products, much less "strongly justified" its use before the FDA. Nor is the use of benzene as a residual solvent in manufacturing aerosol antiperspirant products "supported by the safety data" in light of the known health risks associated with exposure to benzene as detailed herein.

28.     The FDCA defines "cosmetics" by their intended use, as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body...for cleansing, beautifying, promoting attractiveness, or altering the appearance[.]" Federal Food, Drug, and Cosmetic Act § 201(i). "Cosmetic companies have a legal responsibility for the safety of their products and ingredients."[22]

29.     The manufacture of any cosmetic that is adulterated or misbranded is prohibited.[23]

30.     The adulteration or misbranding of any cosmetic in interstate commerce is prohibited.[24]

31.     The introduction into commerce of any misbranded or adulterated cosmetic is

---

[21] https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf (USP General Chapter Residual Solvents).
[22] https://www.fda.gov/cosmetics/resources-consumers-cosmetics/cosmetics-safety-qa-personal-care-products.
[23] 21 U.S.C. §331(a).
[24] 21 U.S.C. §331(b).

similarly prohibited.[25]

32.     The receipt in interstate commerce of any adulterated or misbranded cosmetic is also

unlawful.[26]

33.     A cosmetic is misbranded if its labeling is false or misleading.[27]

34.     Defendant did not disclose benzene, a known human carcinogen, is present in the

Products purchased by Plaintiff and the putative class members. As a result of benzene

contamination in the Products, they are considered adulterated and misbranded. There is no "no

safe level of benzene" exposure in cosmetics, so it is unsuitable for human application as a dry

shampoo.[28]

35.     Defendant wrongfully advertised and sold the Products without any labeling to

indicate to consumers that the Products contain benzene. The following image is illustrative of the

labels contained on the Products purchased by Plaintiff and the class members:





---

[25] 21 U.S.C. §331(a).
[26] 21 U.S.C. §331(c).
[27] 21 U.S.C. §362(a) (cosmetic).
[28] https://www.who.int/ipcs/features/benzene.pdf.

36.     Plaintiff and members of the putative Montana Sub-Class read and relied on one or more of the aforementioned representations in deciding to purchase and use the Products. Plaintiff would not have purchased the Products, or paid less for them, had she known that these claims were false and misleading.

37.     Similarly, Plaintiff and members of the putative Montana Sub-Class read and relied on the Products' labels in deciding to purchase and use the Products. Defendant's omission of the presence of, or risk of presence of, benzene on the labels was a material factor in influencing Plaintiff's decision to purchase and use the Products. Plaintiff would not have purchased and used the Products, or would have paid less for them, had she known that the Products either contain, or have a risk of containing, benzene.

38.     Indeed, no reasonable consumer is going to purchase a dry shampoo product, or, alternatively, pay a premium for it, if he or she cannot know whether the product pulled off the shelf is one that is contaminated with a cancer causing drug. No reasonable consumer is going to play Russian Roulette with dry shampoo products.

39.     The aforementioned representations and omissions are false and/or misleading because nowhere on the Products' labels (or elsewhere in Defendant's marketing of the Products) does Defendant insinuate, state, or warn consumers that the Products contain, or have a risk of containing, benzene.

40.     Plaintiff has standing to represent members of the putative class with respect to the Products they purchased and the Products they did not purchase because there is sufficient similarity between the Products. Specifically, all of the Products are marketed in substantially the same way – as "dry shampoo" - and all of the Products fail to include labeling indicating to consumers that the Products contain, or may contain, benzene.

41.     Because Defendant did not disclose benzene, a known human carcinogen, is present

in the Products purchased by Plaintiff and the putative class members, the Products are adulterated and misbranded. As noted by the World Health Organization, there is no "no safe level of benzene" exposure, so it is unsuitable for human application as an ingredient in dry shampoo.

42.     In addition to Product labeling, Defendant makes a significant number of representations and/or warranties regarding the safety of the Products in its advertising. For example, Defendant assures consumers that, " [a]t DeMert Brands the quality of our goods is truly our number one priority."[29]

43.     Defendant claims it source, "clean, quality ingredients,"[30] but then fails to inform consumers that its Products contain, or may contain, benzene.

44.     Plaintiff and members of the putative class read and relied on one or more of the aforementioned representations in deciding to purchase and use the Products. Plaintiff would not have purchased the Products, or would have paid less for them, had she known that these claims were false and misleading.

45.     The aforementioned representations and omissions are false and/or misleading because nowhere on the Products' labels (or elsewhere in Defendant's marketing of the Products) does Defendant insinuate, state, or warn consumers that the Products contain, or may contain, benzene.

46.     Accordingly, the misleading effect of *all* the Products' marketing and labels are substantially the same. Had Plaintiff and members of the putative class known that *any* of the Products were, or could be, contaminated with benzene, they would not have purchased, or would have paid less for, the Products. Thus, Plaintiff and members of the putative class have "lost money" as a result of Defendant's misrepresentations. Moreover, the decision to purchase or not purchase

---

[29] https://www.demertbrands.com/about/ (last viewed 12/12/2022)
[30] https://www.demertbrands.com/not-your-mothers-haircare/ (last viewed 12/12/2022)

Products that contain benzene at any level is a financial and healthcare decision that affects the Plaintiff and members of the putative class in a personal and individual way, thus conferring a particularized injury. By failing to disclose the presence, or potential presence, of benzene in its Products, Plaintiff and members of the putative class have been denied the opportunity to make those informed decisions. As a result, Plaintifs and members of the putative class have suffered a particularlized injury for purposes of Article III standing.

## **CLASS ALLEGATIONS**

47.     Plaintiff bring this action on behalf of herself and all other similarly situated class members (hereafter the "Class") pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following class against Defendant for violations of Montana state laws and/or similar laws in other states:

### **Nationwide Class**

All consumers who purchased, for personal use and consumption, any Not Your Mother's dry shampoo product in the United States of America and/or its territories for from December 16, 2018 to the present.

Excluded from the Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

48.     In the alternative, Plaintiff bring this action on behalf of herself and all other similarly situated Montana consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Sub-Classes:

### **Montana Sub-Class**

All consumers who purchased, for personal use and consumption, any Not Your Mother's dry shampoo product in the State of Montana from December 16, 2018 to the present.

Excluded from the Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all

governmental entities, and any judge, justice or judicial officer presiding over this matter.

49.     Plaintiff and her counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff has retained counsel experienced in complex litigation and class actions. Plaintiff's counsel has successfully litigated other class action cases similar to those here and have the resources and abilities to fully litigate and protect the interests of the Class. Plaintiff intends to prosecute this claim vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class, nor is Plaintiff subject to any unique defenses.

50.     The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believe that the proposed Class contains thousands of purchasers of Defendant's Products who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff at this time.

51.     Plaintiff's claims are typical to those of all class members because members of the class are similarly injured through Defendant's uniform misconduct described above and were subject to Defendant's deceptive claims that accompanied each and every Aerosol Antiperspirant Product in Defendant's collection. Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

52.     Plaintiff's claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members. The claims of Plaintiff and all prospective Class members involve the same alleged defect. These common legal and factual questions include the following:

    (a)  whether Defendant's Products contain benzene;

    (b)  whether Defendant's omissions are true, or are misleading, or

        objectively reasonably likely to deceive;

(c)  whether the alleged conduct constitutes violations of the laws

asserted;

(d)  whether Defendant's alleged conduct violates public policy

(e)  whether Defendant engaged in false or misleading

advertising;

(f)  whether Plaintiff and the Class members are entitled to

damages and/or restitution and the proper measure of that

loss; and

(g)  whether an injunction is necessary to prevent Defendant from

continuing to market and sell defective and adulterated

Products that contain benzene, a known human carcinogen.

53.    Plaintiff and her counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff has retained counsel experienced in complex litigation and class actions. Plaintiff's counsel has successfully litigated other class action cases similar to those here, including litigating and settling the J&J sunscreen benzene contamination multi-district litigation. Plaintiff also has the resources and abilities to fully litigate and protect the interests of the Class. Plaintiff intends to prosecute this claim vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class, nor is Plaintiff subject to any unique defenses.

54.    Plaintiff and her counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff has retained counsel experienced in complex litigation and class actions. Plaintiff's counsel has successfully litigated other class action cases similar to those here and have the resources and abilities to fully litigate and protect the interests of the Class. Plaintiff intends to prosecute this claim vigorously. Plaintiff has no adverse or antagonistic interests

to those of the Class, nor is Plaintiff subject to any unique defenses.

55.     A class action is superior to the other available methods for a fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by the Plaintiff and individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Further, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Plaintiff know of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

56.     The Class also may be certified because Defendant has acted or refused to act on grounds applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

57.     Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described above, such as continuing to market and sell Products that are adulterated with benzene, and requiring Defendant to provide a full refund of the purchase price of the Products to Plaintiff and Class members.

58.     Unless a class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiff and the Class members. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

**COUNT I**

**Violation of Montana's and Unfair Trade Practices Act, Mont. Code § 30-14-101 *et seq.***

**(On Behalf of Plaintiff Kerns and the Montana Sub-Class)**

59.      Plaintiff Kerns and members of the putative Montana Sub-Class incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

60.      Plaintiff Kerns brings this Count individually and on behalf of the Montana Sub-Class.

61.      The Montana Unfair Trade Practices Act ("UTPA") declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." Mont. Code § 30-14-103.

62.      As alleged herein, Plaintiff and members of the putative Montana Sub-Class have suffered injury in fact and lost money as a result of Defendant's conduct because they purchased Products from Defendant in reliance on Defendant's representation that the contents of its Products were safe and effective and were not adulterated with benzene, a known human carcinogen.

63.      As alleged herein, Defendant's actions are deceptive and in clear violation of UTPA, entitling Plaintiff and the Class to damages and relief under Mont. Code § 30-14-101 *et seq.*

64.      Defendant has engaged, and continues to engage, in conduct that is likely to deceive members of the public. This conduct includes failing to disclose the level of benzene contamination in the dry shampoo products. This information is important to consumers, including Plaintiff, because "no safe level of benzene can be recommended"[31] so even "trace amounts" of benzene poses a health risk.[32]

---

[31] https://www.who.int/ipcs/features/benzene.pdf.
[32] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.

65.     As recognized by the FDA: "The health consequences of benzene exposure depend on the amount, route, and length of time of exposure."[33] The agency noted that even "small amounts" of benzene exposure, such as through inhalation or skin absorption, over extended periods of time "can decrease the formation of blood cells."[34]

66.     The United States Environmental Protection Agency ("EPA") similarly provides standards for the "Maximum Contaminant Level" [MCL] for drinking water, which the EPA defines as "[t]he highest level of a contaminant that is allowed in drinking water."[35] Given its known human carcinogenic risks, the EPA sets the MCL for benzene in drinking water at "zero."[36] Consistent with these guidelines, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.[37]

67.     By committing the acts alleged above, Defendant has engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of UTPA.

68.     Defendant's conduct, including misrepresenting the safety and efficacy of the Products, is substantially injurious to consumers. Plaintiff has "lost money or property" as required

---

[33] https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.

[34] https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.

[35] United States Environmental Protection Agency, 2018 Edition of the Drinking Water Standards and Health Advisories Tables, at p. vi. file:///C:/Users/jrichards/AppData/Local/Microsoft/Windows/INetCache/Content.Outlook/1ADRNMB0/EPA%202018%20Drinking%20Water%20Standards.pdf.

[36] Id.

[37] Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health (NIOSH), Benzene (https://www.cdc.gov/niosh/npg/npgd0049.html).

for standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

69.     Consumers do not know what level of benzene was detected in the Products Plaintiff purchased. They do not know any specifics about what type of "testing" was conducted, including by whom. As noted, both the medical literature and the FDA have concluded that even "trace amounts" or "small amounts" of benzene exposure poses a health risk.

70.     Because Defendant's misconduct is ongoing and continuing, prospective injunctive relief is necessary. Plaintiff is a frequent and/or long time users of Defendant's Products, and she desires to purchase Defendant's Products in the future if they can be assured that the Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendant may continue to advertise, promote and sell adulterated Products that deceive the public as to their characteristics, contents and/or safety. Plaintiff is likely to again be wronged in a similar way. For example, if Plaintiff or the Class members encounter Defendant's Products in the future and there is a risk those products still contain benzene, Plaintiff or Class members may mistakenly rely on the Product's label and/or advertising to believe that Defendant eliminated benzene from the Products when Defendant did not.

71.     Because Plaintiff and Class members reasonably relied on Defendant's labeling and marketing information to disclose what is contained in the Products, and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury

72.     Montana Statutes, Section 30-14-101 *et seq.*, makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

73.     Montana Statutes, Section 30-14-133, creates a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by another person. Section 30-14-

133 also provides that the prevailing party in litigation arising from a cause of action pursuant to UTPA shall be entitled to recover attorney's fees within the limitations set forth therein.

74.     Defendant is engaged in the practice of manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce Products which constitutes trade and commerce as defined by Section 30-14-102, and is therefore subject to UPTA.

75.     As a result of Defendant's unfair and deceptive trade practices, Plaintiff and the Class members are entitled to an award of attorney's fees pursuant to UTPA.

76.     Wherefore, Plaintiff Kerns and the Montana Sub-Class, pray for judgment against Defendant, as set forth hereafter. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of their Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

77.     In accordance with UTPA, Plaintiff Kerns and the Montana Sub-Class, seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

78.     On behalf of Plaintiff Kerns and the Montana Sub-Class, Plaintiff also seeks an order entitling them and the Class to recover all monies spent on the Defendant's Products, which were acquired through acts of fraudulent, unfair, or unlawful competition.

79.     Wherefore, Plaintiff Kerns and the Montana Sub-Class are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the Defendant's Products.

## COUNT II

## Negligent Misrepresentation/Omission

**(On Behalf of the Nationwide Class and the Montana Sub-Class)**

80.     Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

81.     Through its labeling and advertising, Defendant made representations to the Plaintiff and the Class members concerning the content of its Products.

82.     Defendant has a duty to provide accurate information to consumers with respect to the contents of its Products as detailed above.

83.     Defendant failed to fulfill their duty to accurately disclose, through its labeling, advertising or otherwise, that its Products contain benzene or may contain benzene.

84.     Additionally, Defendant has a duty to not make false representations with respect to its Products.

85.     Defendant failed to fulfill this duty when it made false representations regarding the quality and safety of the Products as detailed above.

86.     Such failures to disclose on the part of Defendant amount to negligent omission and the representations regarding the quality and safety of the product amount to negligent misrepresentation.

87.     Defendant's conduct constitutes fraud in the inducement in that it occurred in connection with misrepresentations, statements or omissions which caused the Plaintiff and putative Class members to enter into a transaction (i.e. to purchase Defendant's Products). As such, Defendant's fraudulent activities occurred independent of the contract to purchase.

88.     Plaintiff and the other members of the Class reasonably relied upon such representations and omissions to their detriment.

89.     By reason thereof, Plaintiff and the other Class members have suffered damages in

an amount to be proven at trial.

## COUNT III

### Strict Product Liability – Failure to Warn

### (On Behalf of the Nationwide Class and the Montana Sub-Class)

90.     Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

91.     Defendant knew or should have known that its Products contained benzene, which is a known carcinogen.

92.     Defendant had a duty to warn Plaintiff and the Class about the presence of benzene in its Products.

93.     In addition, Defendant had a duty to warn Plaintiff and the Class about the dangers of the presence of benzene in its Products.

94.     Defendant knew that the risk of exposure to benzene from use of its Products was not readily recognizable to an ordinary consumer and that consumers would not inspect the product for benzene content.

95.     Defendant did not warn Plaintiff and the Class that the Products contained benzene or about the dangers of the presence of benzene in their Products.

96.     Defendant failed to fulfill this duty when it made affirmative representations regarding the quality and safety of the Products as detailed above. Such affirmative representations regarding the safety of the Products constitute negligent misrepresentations which are independent of Plaintiff's economic losses.

97.     Plaintiff and other Class members have lost time finding alternative dry shampoo products. Plaintiff and the Class have suffered damages by purchasing Products in a manner

promoted by Defendant, and in a manner that was reasonably foreseeable by Defendant. Plaintiff and the members of the Class would not have purchased Defendant's Products, or they would have paid less for them, had they known they contained, or may contain, benzene.

98.    Plaintiff and the Class were justified in their reliance on Defendant's labeling and advertising of the Products for use as dry shampoo.

99.    By reason thereof, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## COUNT IV

### Strict Product Liability – Manufacturing Defect

### (On Behalf of the Nationwide Class and the Montana Sub-Class)

100.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

101.    The Products contained a manufacturing defect when they left the possession of Defendant. Specifically, the Products differ from Defendant's intended result or from other lots of the same product line because they contain benzene.

102.    Plaintiff and members of the Class used the Products in a way that was reasonably foreseeable to Defendant.

103.    As a result of the defects in the manufacture of the Products, Plaintiff and the Class suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against the Defendant as to each and every count, including:

A.     An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class/Sub-Classes, and requiring Defendant to bear the costs of class notice;

B.     An order enjoining Defendant from selling the Products;

C.     An order enjoining Defendant from suggesting or implying that they are safe and effective for human application;

D.     An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling all Products contaminated with benzene;

E.     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.     An order requiring Defendant to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G.     An order requiring Defendant to disgorge any ill-gotten benefits received from Plaintiff and members of the Class/Sub-Classes as a result of any wrongful or unlawful act or practice;

H.     An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

28

I.    An order awarding attorneys' fees and costs to Plaintiff and the Class/Sub-

Classes; and

J.    An order providing for all other such equitable relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.


DATED: December 16, 2022.


                              By:  /s/Chelsie Warner
                              AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
                              CHELSIE WARNER (MT Bar # 11975)
                              17 East Main Street, Suite 200
                              Pensacola, FL 32502
                              Telephone: 850-202-1010
                              Facsimile: 850-916-7449
                              E-mail: cwarner@awkolaw.com
                                      cduer@awkolaw.com

                              *Attorneys for Plaintiff*